PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-1285/1477/1486/1587
_____

JUDY LARSON, BARRY HALL, JOE MILLIRON,
TESSIE ROBB, WILLIE DAVIS, ROMAN SASIK, DAVID
DICKEY, STEVEN WRIGHT, JANE WALDMANN,
ROBERT WISE, JACKIE THURMAN, RICHARD
CHISOLM, MARY PITSIKOULIS, DEBRA LIVELY,
JACQUELINE SIMS, KISHA ORR, Individually and on
behalf of all others similarly situated

v.

AT&T MOBILITY LLC, f/k/a Cingular Wireless LLC;
SPRINT NEXTEL CORPORATION; SPRINT SPECTRUM,
d/b/a/ Sprint Nextel; NEXTEL FINANCE COMPANY,

LINA GALLEGUILLOS; MICHAEL MOORE;
ANTRANICK HARRENTSIAN,
                    Appellants in No. 10-1285,
                    (Pursuant to FRAP 12(a))

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER;

LAW OFFICE OF SCOTT A. BURSOR; FRANKLIN & FRANKLIN; GILMAN & PASTOR; LAW OFFICES OF ANTHONY A. FERRIGNO; REICH, RADCLIFFE & KUTTLER; LAW OFFICES OF CARL HILLIARD; MAGER & GOLDSTEIN; LAW OFFICES OF JOSHUA P. DAVIS; CUNEO, GILBERT & LADUCA,

> Appellants in No. 10-1477
> (Pursuant to FRAP 12(a))

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER; LAW OFFICE OF SCOTT A. BURSOR; FARUQI & FARUQI,

> Appellants in No. 10-1486
> (Pursuant to FRAP 12(a))

JESSICA HALL,

> Appellant in No. 10-1587
> (Pursuant to FRAP 12(a))

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 07-cv-5325)
District Judge:  Hon. Jose L. Linares

_____

Argued
January 12, 2012

2

Before:   McKEE, *Chief Judge*, FUENTES, and JORDAN,
*Circuit Judges*.

(Filed: June 29, 2012)
_____

Scott A. Bursor  [ARGUED]
Bursor & Fisher
369 Lexington Avenue – 10th Fl.
New York, NY  10017

Nadeem Faruqi
Faruqi & Faruqi
320 E. 39th Street – 3rd Fl.
New York, NY  10016

L. Timothy Fisher
Alan R. Plutzik
2125 Oak Grove Blvd.
Walnut Creek, CA  94598

Jacob A. Goldberg
Fauqi & Faruqi
101 Greenwood Avenue - #600
Jenkintown, PA   19046

William J. Pinilis
Pinilis Halpern
160 Morris Street
Morristown, NJ   07960

Sandra G. Smith
Faruqi & Faruqi
101 Greenwood Avenue - #600
Jenkintown, PA   19046

Anthony Vozzolo
369 Lexington Avenue
New York, NY   10017
      *Counsel for Appellants Lina Galleguillos; Michael Moore; Antranick Harrentsian*

Scott A. Bursor
Bursor & Fisher
369 Lexington Avenue – 10th Fl.
New York, NY  10017

Joshua Davis
437 Valley Street
San Francisco, VA  94131

Nadeem Faruqi
Faruqi & Faruqi
320 E. 39th Street – 3rd Fl.
New York, NY  10016

Anthony A. Ferrigno
P.O. Box 5799
San Clemente, FL

L. Timothy Fisher
Alan R. Plutzik
2125 Oak Grove Blvd.
Walnut Creek, CA  94598

J. David Franklin
550 West C Street - #950
San Diego, CA  92101

Pamela Gilbert
Cuneo, Gilbert & LaDuca
507 C Street, NE
Washington, DC   20002

Jacob A. Goldberg
Fauqi & Faruqi
101 Greenwood Avenue - #600
Jenkintown, PA   19046

Jayne A. Goldstein
Shepherd, Finkelman, Miller & Shah
35 E. State Street
Media, PA   19063

David Pastor
63 Atlantic Avenue
Boston, MA  02110

William J. Pinilis
Pinilis Halpern
160 Morris Street
Morristown, NJ   07960

Marc G. Reich
Reich Radcliffe
4675 MacArthur Court - #550
Newport Beach, CA   92660

David S. Senoff
Caroselli, Beachler, McTiernan & Conboy
1500 Walnut Street - #507
Philadelphia, PA   19102

Steven M. Sherman
Sherman Business Law
220 Montgomery Street – 15th Fl.
San Francisco, CA   94104

*Counsel for Appellants, Bramson, Plutzik, Mahler*
*& Birkhaeuser; Law Office Of Scott A. Bursor;*
*Franklin & Franklin; Gilman & Pastor; Law*
*Offices Of Anthony A. Ferrigno; Reich,*
*Radcliffe & Kuttler; Law Offices Of Carl Hilliard;*
*Mager & Goldstein; Law Offices Of Joshua P. Davis;*
*Cuneo, Gilbert & Laduca*

Scott A. Bursor
Bursor & Fisher
369 Lexington Avenue – 10th Fl.
New York, NY  10017

Nadeem Faruqi
Faruqi & Faruqi
320 E. 39th Street – 3rd Fl.
New York, NY  10016

L. Timothy Fisher
Alan R. Plutzik
2125 Oak Grove Blvd.
Walnut Creek, CA  94598

William J. Pinilis
Pinilis Halpern
160 Morris Street
Morristown, NJ   07960

Steven M. Sherman
Sherman Business Law
220 Montgomery Street – 15th Fl.
San Francisco, CA   94104

Sandra G. Smith
Fauqi & Faruqi
101 Greenwood Avenue - #600
Jenkintown, PA   19046
    *Counsel for Appellants, Bramson, Plutzik,*
    *Mahler & Birkhaeuser; Law Office Of*
    *Scott A. Bursor; Faruqi & Faruqi*

Phillip A. Bock
Robert M. Hatch
Bock & Hatch
134 North La Salle Street - #1000
Chicago, IL  60602

Anthony L. Coviello
307 Montgomery Street
Bloomfield, NJ   07003

Robert  J. Evola
Bradley M. Lakin
Lakin Chapman
300 Evans Avenue
P.O. Box 229
Wood River, IL   62095
      *Counsel for Appellant Jessica Hall*

James E. Cecchi  [ARGUED]
Lindsey H. Taylor
Carella, Byrne, Cecchi, Olstein, Brody & Agnello
5 Becker Farm Road
Roseland, NJ   07068

Scott A. George
Seeger Weiss
1515 Market street - #1380
Philadelphia, PA  19102
      *Counsel for Appellees, Judy Larson, Willie Davis,*
      *Joe Milliron, Tessie Robb, Roman Sasik,*
      *David Dickey, Steven Wright, Jane Waldman,*
      *Robert Wise, Jackie Thurman, Richard Chisolm,*
      *Mary Pitsikoulis, Debra Lively, Jacqueline Sims,*
      *And Kisha Orr*

Andrew B. Joseph
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square - #2000
Philadelphia, PA   19103

Joseph Boyle  [ARGUED]
Lauri A. Mazzuchetti
Vincent P. Rao, III
Kelley, Drye & Warren
200 Kimball Drive
Parsippany, NJ   07054
        *Counsel for Appellees Sprint Nextel Corp.,*
        *Sprint Spectrum DBA Sprint Nextel,*
        *Nextel Fin. Co.*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Until late 2008, Sprint Nextel Corporation (collectively with its operating subsidiaries, including Sprint Spectrum L.P., "Sprint") included a flat-rate early termination fee ("ETF") provision in its cellular telephone contracts, which allowed it to charge a set fee to customers who terminated their contracts before the end date stated in the contract.  Because many consumers believed that flat-rate

10

ETFs were illegal penalties, various class action lawsuits were brought against cellular phone service providers who charged flat-rate ETFs, including Sprint. In the case before us now (the "*Larson*" action), the plaintiffs entered into negotiations with Sprint, and, after five months of mediation, the parties decided to settle the matter for $17.5 million, pursuant to the terms of their agreement (the "Settlement Agreement"). Over objections lodged by several class members, the United States District Court for the District of New Jersey certified the settlement class and approved the Settlement Agreement. Objectors Lina Galleguillos, Antranick Harrentsian, and Michael Moore (collectively, the "Galleguillos Objectors"), along with Jessica Hall, appealed.[1] Because the District Court did not adequately protect the rights of absent class members, we will vacate its order and remand the matter for further proceedings.

## I.    Background

### A.    *Class Action and Settlement Agreement*

A flat-rate ETF is one that does not vary during the term of the contract.[2] At the time the *Larson* class action was

---

[1] Two groups of attorneys also appealed, challenging the District Court's allocation of attorneys' fees. Because of the nature of our disposition, we will not address those appeals.

[2] A flat-rate ETF stands in contrast to what is known as a prorated ETF. A prorated ETF is an "[ETF] contract provision that is structured such that the initial amount of the [ETF] will decrease over the term of the contract in some incremental form, resulting in a termination fee at the end of

filed, if a Sprint customer terminated a contract prior to the end of the contract term, Sprint would impose a flat-rate ETF of approximately $200. The *Larson* plaintiffs filed their suit in the District Court on November 5, 2007, alleging that the flat-rate ETFs charged by AT&T Mobility, LLC ("AT&T") and Sprint were illegal penalties that violated the Federal Communications Act and state consumer protection laws. The Complaint was amended twice, with the Second Amended Complaint, as discussed in greater detail herein, being filed by five plaintiffs (the "Class Representatives"). Each of the Class Representatives was charged a flat-rate ETF by Sprint.[3]

Sprint moved to dismiss the *Larson* action pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, but before the District Court rendered a decision on that motion, the Class Representatives and Sprint entered into mediation of the dispute, under the guidance of a retired

---

the contract term which is lower than the initial termination fee." (Appellants' Joint Appendix ("AJA") at 273.) Prorated ETFs are not at issue in this case.

[3] The plaintiffs named in the original Complaint were three individuals who were charged a flat-rate ETF by Sprint and one who was charged a flat-rate ETF by AT&T. The Second Amended Complaint did not include the representative who was charged a flat-rate ETF by AT&T, and added two additional individuals who were charged a flat-rate ETF by Sprint. Thus, none of the Class Representatives in the Second Amended Complaint were charged a flat-rate ETF by AT&T. AT&T was not part of the eventual settlement and is not a party to this appeal.

judge of the District Court. After approximately five months of negotiations, on December 3, 2008, the parties agreed to settle the matter for $17.5 million, comprised of $14 million in cash and $3.5 million in activation fee waivers, bonus minutes, and credit forgiveness (collectively, the "Common Fund").[4] In addition to the monetary relief, the Settlement Agreement also enjoined Sprint from entering into new fixed-term subscriber agreements containing flat-rate ETFs for a period of two years, effective January 1, 2009.[5] Along with

---

[4] If the claims paid out of the cash portion of the Common Fund were to exceed the amount available in the Common Fund, all cash benefits would be reduced pro rata. Any cash that remained in the Common Fund after the close of the claim period was to be converted into a *cy pres* award for distribution to an organization qualifying as tax exempt under § 501(c)(3) of the Internal Revenue Code, or any other organization or institution agreed upon by the parties. After execution of the Settlement Agreement, the parties agreed that any money remaining in the Common Fund would be used to purchase prepaid long distance calling cards for use by members of the U.S. armed forces and their families.

[5] At oral argument, Sprint indicated that it had not collected flat-rate ETFs since December of 2010. In a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), counsel for the Class Representatives confirmed that fact, indicating that the last flat-rate ETF contract expired on December 31, 2010. Thus, even after the Settlement Agreement's two-year injunction prohibiting Sprint from including flat-rate ETFs in subscriber agreements ended on January 1, 2011, it appears that Sprint has not yet resumed including flat-rate ETFs in customer contracts.

13

ending the *Larson* action, the Settlement Agreement expressly resolved ten other lawsuits pending in various state courts, but it excepted certain claims that were being asserted in a California-only state court class action against Sprint captioned *Ayyad v. Sprint Spectrum, LLP* ("*Ayyad*").

The Settlement Agreement provided for four different categories of claimants, three of which are relevant to this appeal:[6]

> Category I. – Claimants Who Paid an ETF (Other Than Category III or IV Class Members):
>
> A.     Those Claimants who had a two-year term contract and terminated within the first six months of that contract term [or (B.) had a one-year term contract and terminated within the first three months of that contract term], and show sufficient proof that they paid an ETF including signing under penalty of perjury,[7] shall be entitled to a payment of $25

---

[6] Category III is entitled "Claimants Who Claim Their Wireless Term Contract(s) Including Amendments, Changes and/or Extensions to the Contract(s) or the Assessment or Potential Assessment of an ETF, or is [sic] Improper, Invalid, Unlawful or Otherwise Unenforceable For Any Reason Whatsoever." (AJA at 289.)  No one contends that the issues on appeal affect the Claimants who would have rights under Category III, and, by the terms of the category, we do not see that they would.

[7] The Settlement Agreement defined an ETF as "any

14

from the Common Fund; or to the extent such Settlement Class Members desire to activate a new service line with Sprint Nextel: (i) a waiver of the approximately $36 activation fee normally charged by Sprint Nextel in connection with obtaining a new two-year contract to become a Sprint Nextel subscriber; and (ii) 100 free bonus minutes per month for the first year of that two-year contract. …

….

C.      Those Claimants who had a two-year term contract and terminated at any time between the seventh to the twenty fourth month of that contract term [or (D.) had a one-year term contract and terminated within the fourth to twelfth month of that contract term], and show sufficient proof that they paid an ETF including signing under penalty of perjury, shall be entitled to a payment of $90 from the Common Fund; or to the extent such Settlement Class Members desire to activate a new service line with Sprint Nextel: (i) a waiver of the approximately $36 activation fee normally charged by Sprint Nextel in connection with obtaining a new two-year contract to become a

---

charge described, imposed, charged, or collected pursuant to a provision in a fixed-term subscriber agreement calling for the payment of a flat-rate amount for terminating the agreement prior to expiration of the agreement's specified term." (AJA at 267.)

Sprint Nextel subscriber; and (ii) 100 free bonus minutes per month for the first year of that two-year contract. …

….

E. Those Claimants who cannot show sufficient proof that they paid an ETF, but sign under penalty of perjury that they paid an ETF will receive $25 cash payment; or to the extent such Settlement Class Members desire to activate a new service line with Sprint Nextel: (i) a waiver of the approximately $36 activation fee normally charged by Sprint Nextel in connection with obtaining a new two-year contract to become a Sprint Nextel subscriber; and (ii) 100 free bonus minutes per month for the first year of that two-year contract. …

Category II. – Claimants Who Were Charged an ETF But Did Not Pay the ETF:

A. Those Claimants who had a two-year term contract and terminated within the first six months of that contract term [or (B.) had a one-year term contract and terminated within the first three months of that contract term], and show sufficient proof that were charged an ETF, including signing under penalty of perjury, shall be entitled to $25 in credit relief, if the debt owed to Sprint Nextel is still owned by Sprint Nextel; or to the extent such Settlement Class Members desire to activate a new service line with Sprint Nextel:

16

(i) a waiver of the approximately $36 activation fee normally charged by Sprint Nextel in connection with obtaining a new two-year contract to become a Sprint Nextel subscriber; and (ii) 100 free bonus minutes per month for the first year of that two-year contract. …

….

C. Those Claimants who had a term contract and terminated after the seventh month of a two year term or terminated after the fourth month of a one year term, and show sufficient proof that they were charged an ETF, including signing under penalty of perjury, shall be entitled to (i) a $90 credit, if the debt owed to Sprint Nextel is still owned by Sprint Nextel; or (ii) to the extent such Settlement Class Members desire to activate a new line of service with Sprint Nextel: (i) a waiver of the approximately $36 activation fee normally charged by Sprint Nextel [for] free activation in connection with obtaining a new two-year contract to become a Sprint Nextel subscriber; and (ii) 100 free bonus minutes per month for the first year of that two-year contract. …

….

Category IV. – Claimants Whose Claim Arises After Notice to The Class But Before January 1, 2011:

H. Any Claimant who has a wireless line of service under a term contract entered into before January 1, 2009 and is subject to a flat-rate ETF that terminates after the close of the notice period, whose Approved Claim arose after the notice for approval of Settlement is provided to the Settlement Class but before January 1, 2011, and who swears under penalty of perjury that they were harmed as a result of the flat-rate ETF will be entitled to either: (i) a Sprint Nextel prepaid 90 minute Long Distance Calling Card to be purchased out of the Common Fund; (ii) to the extent such Settlement Class Member desires to activate a new line of service with Sprint Nextel, a waiver of the approximately $36 activation fee normally charged by Sprint Nextel in connection with obtaining a new two-year contract to become a Sprint Nextel subscriber and 100 free bonus minutes per month for the first year of that two year contract; or (iii) 300 free text messages per month for six months. …

(Appellants' Joint Appendix ("AJA") at 283-291.)

The Settlement Agreement released Sprint from all ETF-related claims, including claims "arising from or relating to any decision by Sprint … to impose [or] collect … an Early Termination Fee, regardless of the basis for the customer's claim that the fee should or should not be imposed [or] collected." (AJA at 270.) The Settlement Agreement defined the "Claim Period" – that is, the time frame in which eligible claimants are entitled to file a claim to acquire the

18

relief set forth in the Settlement Agreement – as "the period beginning 30 days after entry of the Preliminary Approval Order and ending 60 days after entry of the Final Approval Order and Judgment" related to the class settlement. (AJA at 263-64.) However, "the Claim Period d[id] not apply to Category IV benefits [, as] the deadline for submitting a Category IV benefit Claim Form [was] January 1, 2011." (AJA at 264.)

B.    *Class Certification and Settlement Approval*

On December 8, 2008, the District Court entered an order preliminarily approving the Settlement Agreement and conditionally certifying the class under Federal Rule of Civil Procedure 23(b)(3).[8] The settlement class was defined as follows:

> All persons in the United States who are or were parties to a personal fixed-term subscriber agreement for a Sprint Nextel Wireless Service Account for personal or mixed business/personal use, whether on the Sprint CDMA network or Nextel iDen network, or both, excluding accounts for which the responsible party for the Wireless Service Account is a business, corporation or a governmental entity, entered into between July

---

[8] Under Rule 23(b)(3), and assuming compliance with Rule 23(a), a court may certify a class when "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

19

1, 1999 and December 31, 2008 and whose claims relate in any way to an Early Termination Fee or use of an Early Termination Fee in a fixed-term subscriber agreement, and/or use or propriety of a fixed-term subscriber agreement whether the term was for the initial fixed-term subscriber agreement or subsequent extensions or renewals to the fixed-term subscriber agreement for whatever reason and/or who were charged by or paid an Early Termination Fee to Sprint Nextel, excluding only the *Ayyad* Class Claims and Persons whose right to sue Sprint Nextel as a Settlement Class Member is otherwise barred by a prior settlement agreement and/or prior final adjudication on the merits. The Settlement Class includes Persons who were subject to an ETF, whether or not they paid any portion of the ETF either to Sprint Nextel or to any outside collection agency or at all, and includes persons who are prosecuting excluded claims to the extent such persons have claims other than those expressly excluded.

(AJA at 7-8 (internal footnote omitted).)

After preliminarily approving the Settlement Agreement, the District Court set forth a schedule for the final approval process, including allowing class members to lodge objections to the class certification and the Settlement Agreement.

20

1.      *Initial Fairness Hearing*

The District Court held an initial approval hearing (the "Initial Fairness Hearing") over a four-day period in March of 2009. In papers filed prior to that hearing, the Galleguillos Objectors attacked many aspects of the adequacy of notice given to potential class members about the class action. In particular, they complained about the efforts undertaken by Sprint to produce a class member list for use in providing individual notice to class members.[9] Following that hearing, on April 30, 2009, the Court issued an opinion agreeing with the Galleguillos Objectors that the initial notice plan ("INP") did not comply with Rule 23(c)(2), which requires "the best notice that is practicable … ."[10] Fed. R. Civ. P. 23(c)(2)(B). Accordingly, the Court issued an order denying final approval of the settlement without prejudice, and ordered counsel for the Class Representatives ("Class Counsel") and Sprint to submit a new notice plan within 21 days.

---

[9] Appellant Hall also objected to the settlement prior to the Initial Fairness Hearing, alleging that the Settlement Agreement was the product of a reverse auction. "A 'reverse auction' is generally 'the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement [with, in] the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.'" (AJA at 31-32 (quoting *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 308 (3d Cir. 2005)).) That claim and another one – that class notice was deficient because the costs of notice and administrative expenses were to be paid from the Common Fund, *see infra* note 17 – were rejected by the Court. *See infra* note 18.

[10] More fully, Rule 23(c)(2)(B) provides, in relevant

In its opinion holding the INP deficient, the District Court instructed Sprint "to attempt to identify subclasses of individuals [who paid an ETF] and include individual notice to those persons." (AJA at 4264.) The Court determined that, based on data provided by Sprint, it would be unreasonable for Sprint to compile a full list of class members from 1999-2008 because it would require six to twelve months of work at a cost of at least one million dollars. However, also based on records provided by Sprint, the Court found that "Sprint could conduct an inquiry as to whether … it can identify specific subsets of customers – whether by year, geographic region, ETF paid, or type of contract – that are members of the class," and the Court concluded that, "therefore … the Galleguillos Objectors assert[ion] that partial class lists are as noticeable as complete ones … has merit." (AJA at 4260.)

The District Court meticulously reviewed case law discussing what constitutes a reasonable effort at sending individual notice to class members, and it held that "Rule 23(c)(2) [could not] be so easily circumvented by undertaking only an analysis of identifying each and every class member,

---

part:

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

Fed. R. Civ. P. 23(c)(2)(B).

rather than some or most class members." (AJA at 4263.) Instead, the Court said that:

> Sprint must do more than it has done thus far … [because] those subclasses capable of reasonable identification require individual notice. This especially holds true in a case such as this one, where those who paid an ETF are entitled to recover the lion's share of the settlement but are generally unlikely to be current Sprint customers.

(AJA at 4264.) The Court instructed Class Counsel and Sprint to construct a new notice plan that included, *inter alia*, "an indication from Sprint as to what subclasses of subscribers are reasonably identifiable and a corresponding plan to provide individual notice to those subscribers."[11] (AJA at 4274.) Because the Court "found notice to be insufficient," it concluded that it "lack[ed] jurisdiction over

---

[11] The Court also instructed that the new notice plan should include at least five other items: (1) "a new form of individual notice that contain[ed] the 23(c)(2) elements"; (2) "a plan to supply that notice to members of the *Robertson* class [a related litigation in California where Sprint had compiled a list of all members of a class that had paid flat-rate ETFs]"; (3) "a plan to supply that individual notice to all current Sprint subscribers"; (4) "a new form of notice publication that is fully compliant with 23(c)(2) and 23(e)"; and (5) "a full publication plan that, in conjunction with individual notice, will provide the 'best notice practicable.'" (AJA at 4274-75.)

the absent class members," and, "[u]ntil notice [was] properly administered," it could not "evaluate the reasonableness of the settlement." (AJA at 4276.)

## 2. *Amended Notice Plan*

In response to the District Court's April 30, 2009 opinion and order, Sprint and Class Counsel submitted a proposed Amended Notice Plan ("ANP") on May 21, 2009.[12] Although it addressed several of the concerns that the Court had with the INP,[13] the proposed ANP stated that it would be unreasonable to search any of Sprint's billing records to identify subclasses of individuals who had been charged a flat-rate ETF. To support that contention, Sprint and Class Counsel attached as an exhibit to the proposed ANP a declaration from Sprint's Vice President of Customer Billing

---

[12] The day before the ANP was submitted, the Court granted Sprint's and Class Counsel's motion for reconsideration regarding publication notice, finding the publication notice complied with Rule 23. That order, however, specifically noted that the portions of the Court's April 30, 2009 opinion addressing lack of proper individual notice remained in effect.

[13] Specifically, the proposed ANP included the following modifications from the INP: (1) a bill insert to send to its current customers which was Rule 23-compliant, at an estimated cost of $750,000; (2) individual notice to 194,461 subscribers of the *Robertson* class, at an estimated cost of $73,895; and (3) individual notice to approximately 90,000 subscribers that it could identify without searching its billing records, at an estimated cost of approximately $34,623.

24

Services, Scott Rice (the "Rice Declaration"). The Rice Declaration detailed the efforts that would be required to search Sprint's billing records for class members who were charged a flat-rate ETF. Specifically, it noted that, "without unforeseen interruptions or data losses" (AJA at 5504), it would take one to two months to capture information for class members who were charged a flat-rate ETF between April 1, 2009 and June 30, 2009, at an estimated cost of $20,000, and it would take four to five months to capture information for class members who were charged a flat-rate ETF between April 1, 2007 to March 31, 2009, at an estimated cost of $80,000. Because, in the view of Sprint and Class Counsel, "such efforts would require an unreasonable amount of time at a substantial cost," the ANP they proposed did not provide for any search of Sprint's billing records.[14] (AJA at 4337.)

Twelve days later, on June 2, 2009, the District Court entered an order approving the ANP. The Court explained that it was "satisfied – upon examining [the Rice Declaration] – that it would be unreasonable to require Sprint to engage in further efforts to individually identify additional class members [because] [t]he time, cost, and effort associated with poring through and analyzing the various Sprint databases [were] not reasonable." (AJA at 4347.) Therefore, the Court found "that individual notice, as outlined [in the ANP], [was]

---

[14] Sprint and Class Counsel did note that "[i]f the Court believe[d] that it would be reasonable for Sprint to engage in any of the further efforts set forth in the Rice [Declaration], Sprint [was] willing to do so. However, the dates for the final approval hearing and the exclusion and objection deadlines would have to be pushed out by at least a few months." (AJA at 4337 n.3.)

25

sufficient to satisfy Rule 23." (*Id.*) The District Court set the second final approval hearing (the "Second Fairness Hearing") for October 21, 2009, and set October 7, 2009 as the "[d]eadline for any member of the settlement class … to file specific objections to the settlement." (*Id.*)

### 3. *Second Fairness Hearing*

The Galleguillos Objectors submitted a brief on the October 7, 2009 deadline, arguing, among other things, that the ANP was inadequate under Rule 23(c)(2)(B) and that the Class Representatives themselves were inadequate to satisfy the requirements of Rule 23(a).[15] With respect to the ANP, the Galleguillos Objectors said that Sprint wrongly failed to provide individual notice to 9.2 million reasonably identifiable class members who had been charged flat-rate ETFs between April 1, 2007 and June 30, 2009. With respect to the Class Representatives, they asserted that the interests of class members who were current Sprint customers were not adequately protected because the Class Representatives "[had] no interest in stopping [the flat-rate ETF] charges

---

[15] Rule 23(a) provides, in part, that, in order to certify a class, a court must find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Although the Galleguillos Objectors did not specifically cite to Rule 23(a) in their October 7 brief, they cited to a case, *Hassine v. Jeffes*, 846 F.2d 169 (3d Cir. 1988), that specifically discussed the proper inquiry that a court should make to determine whether class representatives are adequate under Rule 23(a)(4), *see infra* Part II.B, and they couched their claim as challenging various prerequisites of Rule 23(a) that they alleged were not satisfied.

because, as former customers, they [were] no longer subject to them." (AJA at 5554.)

On October 14, Sprint submitted a memorandum in response to the objections related to the adequacy of notice.[16] It contended that the 9.2 million number cited by the Galleguillos Objectors was overstated because the Sprint document on which that number was based included flat-rate ETFs charged to government and corporate accounts as well as individual accounts. Although Sprint acknowledged "that the number of Settlement Class Members who were charged an ETF could measure into the tens of millions," and a search of its billing records "could result in the identification of millions of Settlement Class Members," Sprint argued that the Court had already "properly concluded that the effort to identify [those] Settlement Class Members would not be reasonable." (AJA at 4706.) On October 19, two days before the Second Fairness Hearing, the Galleguillos Objectors conceded that the 9.2 million number was overstated and submitted the testimony of an expert who examined Sprint's databases from the *Ayyad* case to provide a corrected estimate. That expert indicated that, using "a widely available statistical software package" (AJA at 5625), he was able to quickly sort the data to find that 44.95% of the customers from those databases were individual accounts. Therefore, the Galleguillos Objectors revised their initial

---

[16] That memorandum did not respond to the Galleguillos Objectors' contention that the Class Representatives could not adequately represent the interests of all class members.

27

figure of 9.2 million individual class members to 4.2 million.[17]

The Second Fairness Hearing went forward as scheduled on October 21, 2009.

### 4.    *Order Approving Class Certification and Settlement*

In an opinion dated January 15, 2010, the District Court overruled all objections,[18] certified the proposed

---

[17] Objector Hall also renewed her objection that the settlement was the product of a reverse auction. Additionally, Hall claimed that the class notice was still deficient because Class Counsel and Sprint provided that the costs of notice and administrative expenses, including the ANP, were to be paid from the Common Fund, and Hall asserted that those costs should instead be borne by Sprint and/or Class Counsel.

[18] The Court thus also overruled both of Hall's objections. With regard to the reverse auction claim, the Court stated that it had been presented with no evidence of collusiveness "[a]side from the mere overlap of time when counsel for Jessica Hall and Class Counsel were apparently negotiating with Sprint." (AJA at 32.) In contrast, the Court pointed out that "[the retired district judge], who oversaw five months of intense settlement negotiations, specifically dismissed the idea that the Settlement was the product of a reverse auction or collusion." (*Id.*) Thus, the Court determined that the reverse auction claim was "baseless." (*Id.*) The Court then turned to Hall's argument that payment for additional notice should not come from the Common Fund but rather be borne by either Sprint or Class Counsel.

settlement class, and approved the Settlement Agreement.

Though noting Hall's "objection [was] well taken," the Court cited to the Settlement Agreement, which contemplated that "all costs" of providing notice would come out of the Common Fund. (*Id.*) The Court also cited to the ANP, which provided that Sprint and Class Counsel would seek reimbursement from the Common Fund for the re-notice costs. Accordingly, the Court did not accept Hall's notice objection.

Hall has raised those same two objections to us on appeal, re-framing her notice-related claim as an attack on the Court approving a settlement that was neither fair, reasonable, nor adequate, as required under Rule 23(e)(2). *See* Fed. R. Civ. P. 23(e)(2) ("If the propos[ed] [settlement] would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."). We conclude that the District Court did not abuse its discretion in rejecting Hall's first objection. Regarding the reverse auction claim, as the District Court noted, Hall's assertion was directly contradicted by the retired district judge who oversaw five months of negotiation between the parties. Concerning the attack as to the adequacy of the settlement, in evaluating whether the settlement was fair, reasonable, and adequate, the District Court utilized the proper test by analyzing each of the nine factors as laid out in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). After such analysis, it determined that the settlement was fair, reasonable, and adequate. Because notice issues remain to be resolved and because we also question whether the Class Representatives were adequate under Rule 23(a)(4), *see infra* Part II.B, we make no comment on whether the settlement was fair, reasonable, and adequate.

29

Regarding adequacy of representation under Rule 23(a)(4), the District Court stated that two factors must be considered: "(1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." (AJA at 10-11 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 519 (D.N.J. 1997)).) The Court noted that "[n]o objection has been lodged specifically as to the qualification and capabilities of Class Counsel," and it also determined that the "interests [of the Class Representatives] [were] not antagonistic to those of other members of the Class." (AJA at 11.) Acknowledging the Galleguillos Objectors' contention that the Class Representatives were not adequate because none of them were current subscribers subject to a flat-rate ETF and thus did not negotiate or attempt to enjoin Sprint from enforcing its flat-rate ETF against current customers, the Court said that, if current subscribers who were subject to a flat-rate ETF were "otherwise harmed because of the existence of the flat-rate ETF, such Class members would fall into Category IV … and would be entitled to the relief afforded therein."[19] (AJA

---

[19] The District Court made that remark after specifically referring to a group known as the California Subscriber Class Claims, class members that were Sprint customers who "[had] not allege[d] that they had been charged and/or paid an ETF, but instead alleged simply that they were subject to an ETF in their subscriber agreement." (AJA at 12.) For purposes of relief afforded under the Settlement Agreement, the members of the California Subscriber Class were in the same position as all class members who were current customers and still subject to a flat-rate ETF and had not been charged a flat-rate ETF.

at 12.) The Court further noted that the type of injunctive relief that the Galleguillos Objectors sought – allowing current subscribers to terminate without paying a flat-rate ETF – "could potentially expose such Class members to a counterclaim for damages from Sprint."[20] (AJA at 12 (citing *Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 511 P.2d 1197, 1203-04 (Cal.1973)) ("We do not hold herein that merely because the late charge provision is void and thus cannot be used in determining the lender's damages, the borrower escapes unscathed. He remains liable for the actual damages resulting from his default.").)

The District Court then addressed the Galleguillos Objectors' notice-related claims. Concerning the reach of individual notice, the District Court rejected the contention that Sprint failed to provide notice to 9.2 million identifiable class members.[21] The Court said that the "crux" of that

Accordingly, we assume the Court's analysis here was meant to apply to all class members that were current Sprint subscribers.

[20] That statement was also made in the context of referring to the California Subscriber Class Claims, and we make the same inference here as stated in note 19, *supra*.

[21] The District Court noted that the "Galleguillos Objectors now concede that the 9.2 million figure [was], at the very least, based on outdated data and therefore unreliable." (AJA at 22.) The Court did not mention that the Galleguillos Objectors submitted a revised estimate of 4.2 million class members. In a footnote, the Court pointed out that the Galleguillos Objectors "made no effort to obtain additional data" from Sprint or Class Counsel until two weeks

objection was "that Sprint could have identified millions of additional class members through Sprint's own billing records." (AJA at 22.) The response was that "[e]ven if such speculation were correct, the Court ha[d] already examined the Rice Declaration and found that the time, cost and effort necessary to do so … would be unreasonable in light of all the circumstances."[22] (*Id*.)

The Court concluded that it was "satisfied that it would be unreasonable to require Sprint to engage in further efforts to identify class members beyond" the approximately 285,000 additional individuals who received individual notice of the settlement for the first time through the ANP. (AJA at 26.) The Court noted that, just prior to the ANP, only 12,501 claim forms for 19,105 lines of service had been submitted. Since the implementation of the ANP, however, an additional 44,408 claim forms for 66,913 lines of service had been

---

before the Second Fairness Hearing, and the Court was not aware of such matters until less than a week before the Second Fairness Hearing. (AJA at 22 n.15.) "As a result, their belated efforts to obtain such data were denied by the Court as untimely." (*Id*.)

[22] The District Court also emphasized that, after Sprint and Class Counsel proposed the ANP on May 21, 2009, the Court received no opposition to it prior to approving the plan on June 2, 2009. Similarly, the Court rejected the Galleguillos Objectors' claim that the Rice Declaration was inadmissible, reasoning that that claim was waived because no action was taken on that objection until October 7, 2009, the deadline to file objections, over four months after the Court had approved the ANP.

submitted. Because the Court viewed the notice plan as "robust, thorough, and includ[ing] all of the essential elements to properly apprise absent Class members of their rights," it concluded that the "parties ha[d] now fully complied with the stringent requirements set forth by Rules 23(c)(2)(B) and 23(e)."[23] (AJA at 26-27.)

The Court entered a final order certifying the proposed settlement class under Rule 23(a) and 23(b)(3) and granting final approval to the Settlement Agreement. Appellants then timely filed the present appeals.

## II. Discussion[24]

The Galleguillos Objectors renew on appeal many of the objections they made before the District Court, asserting, among other things, that the District Court abused its discretion by finding that it would be unreasonable to require Sprint to perform any search of its billing records to provide individual notice to class members who had been charged a flat-rate ETF, and that the Court further abused its discretion by holding that the Class Representatives were adequate. Our

---

[23] After that analysis, the District Court analyzed the nine *Girsh* factors, *see supra* note 18, to evaluate whether the settlement was "fair, reasonable, and adequate" under Rule 23(e)(2), and determined that it was so. The Court also approved the attorneys' fee award, as well as addressed the allocation of that award.

[24] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(d), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

disposition of these appeals focuses on the first of those issues, though we think the second warrants comment as well.

As the framing of the objectors' arguments indicates, we review a district court's decision to certify a class and approve a settlement for an abuse of discretion. *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) (citation omitted). An abuse exists "where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (citation and internal quotation marks omitted).

### A.    *Billing Records Search*

The Rice Declaration was the sole basis on which the District Court determined that it would be unreasonable for Sprint to search its billing records to identify class members who had been charged a flat-rate ETF. Even accepting the contents of the Rice Declaration,[25] the Galleguillos Objectors

---

[25] The Galleguillos Objectors also challenge the District Court's ruling that their objections to the Rice Declaration were waived because that objection was not made in a timely manner. The Galleguillos Objectors had alleged that the Rice Declaration was inadmissible under Federal Rules of Evidence 601, 602, 701, 702, and 802. Sprint and the Class Representatives argue that the Court properly determined the objections to the Rice Declaration were waived because the Galleguillos Objectors did not object until October 7, 2009, more than four months after the ANP's June 2, 2009 implementation. The Galleguillos Objectors respond that they filed the objection by the October 7, 2009 deadline set in the District Court's order implementing the ANP.

34

claim that the District Court failed to properly exercise its discretion when it determined that it would be unreasonable to require any such search of those records for the purpose of providing individual notice to those class members. We agree.

The Rice Declaration estimated that, to capture contact information for class members who were charged a flat-rate ETF between April 1, 2007 and June 30, 2009, a search would take approximately four to five months at an estimated cost of $100,000.[26] Sprint candidly acknowledged before the District Court, and likewise represents to us,[27] that the search

---

Moreover, they argue that there was no prior deadline to adhere to since the proposed ANP had not been heard on a noticed motion, and thus there was no briefing schedule setting the date by which the District Court expected a response. Furthermore, they contend that the 12 days between the filing of the Rice Declaration and the order approving the ANP was not an adequate amount of time to respond. Without deciding the matter, we accept for purposes of this opinion that the Rice Declaration was admissible.

[26] Specifically, the Rice Declaration estimated that it would take one to two months to acquire information for class members who were charged a flat-rate ETF between April 1, 2009 and June 30, 2009 at a cost of approximately $20,000, and four to five months to obtain that information for class members who were charged a flat-rate ETF between April 1, 2007 and March 31, 2009 at a cost of about $80,000. *See supra* Part I.B.2.

[27] Class Counsel, on behalf of the Class Representatives, filed a letter indicating that the Class

efforts described in the Rice Declaration could result in the identification of millions of class members. After examining the Rice Declaration, however, the District Court, both in its order approving the ANP and in its opinion approving the final settlement, concluded that it would be unreasonable for Sprint to undertake the search of its billing records because of the "time, cost and effort necessary to do so." (AJA at 22; *see also* AJA at 4347 ("The time, cost, and effort associated with poring through and analyzing the various Sprint databases are not reasonable… .").) Given the requirements of Rule 23(c) and of our precedents, and in light of the record before the District Court, that decision cannot stand.

As noted earlier, Rule 23(c)(2)(B) requires "individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Supreme Court discussed what constitutes "reasonable effort" in *Eisen v. Carlisle & Jacquelin*, which involved a prospective class consisting of nearly six million individuals who had engaged in odd-lot stock purchases. 417 U.S. 156, 166 (1974). The district court in that case had noted that at least two million of those individuals could be identified by names and addresses "[b]y comparing the records and tapes of the odd-lot firms with the wire firm tapes which contain the name and address of each customer," *Eisen v. Carlisle & Jacquelin*, 52 F.R.D.

Representatives join the arguments made by Sprint in Sprint's brief responding to the claims made by the Galleguillos Objectors in their opening brief. Thus, when we refer hereinafter to arguments made by Sprint in response to the opening brief filed by the Galleguillos Objectors, it should be understood that such arguments are also advanced by the Class Representatives.

36

253, 257 (S.D.N.Y. 1971), *rev'd*, 479 F.2d 1005, 1020 (2d Cir. 1973), *aff'd*, 417 U.S. 156 (1974), and that "an additional 250,000 persons who had participated in special investment programs involving odd-lot trading" could also be reasonably identified, 417 U.S. at 166-67. Including the price of first class postage, the district court determined that individual notice to all identifiable class members would cost $225,000. *Id.* at 167. It held, however, that such a substantial expenditure was not required at the outset of the litigation, and ordered limited individual notice, 90% of the cost to be paid by petitioner. *Id.* The United States Court of Appeals for the Second Circuit reversed, holding that Rule 23(c)(2) required individual notice to all identifiable class members, with the entire cost to be paid by petitioner as the representative plaintiff. *Id.* at 169.

The Supreme Court agreed with the Second Circuit and said that "the names and addresses of 2,250,000 class members [were] easily ascertainable, and there [was] nothing to show that individual notice [could not] be mailed to each." *Id.* at 175. The Court expressly rejected petitioner's argument that the requirement of individual notice should be "dispense[d] with … in this case … [because of] the prohibitively high cost of providing individual notice to 2,250,000 class members." *Id.* As the Court put it, "individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23. … Accordingly, each class member who can be identified through reasonable effort must be notified… ." *Id.* at 176. The Court noted that "[t]here is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocketbooks of particular plaintiffs." *Id.* And the Court also

stated that notice by publication "had long been recognized as a poor substitute for actual notice." *Id.* at 175 (citation omitted). Thus, *Eisen* stands for the proposition that individual notice must be delivered to class members who can be reasonably identified, and that the costs required to actually deliver notice should not easily cause a court to permit the less satisfactory substitute of notice by publication.

In *Oppenheimer Fund, Inc. v. Sanders*, the Supreme Court again had occasion to consider the individual notice requirement. 437 U.S. 340 (1978). To identify class members in *Oppenheimer Fund*, the representative plaintiffs sought to require the defendants, an investment fund, its management corporation, and a brokerage firm, to help compile a list of names and addresses of class members from records kept by the transfer agent for one of the defendants, so that the individual notice required by Rule 23(c)(2) could be sent. 437 U.S. at 342. The class was estimated to include approximately 121,000 persons. *Id.* at 344-45. The transfer agent's employees testified that:

> [I]n order to compile a list of the class members' names and addresses, they would have to sort manually through a considerable volume of paper records, keypunch between 150,000 and 300,000 computer cards, and create eight new computer programs for use with records kept on computer tapes that either [were] in existence or would have to be created from the paper records.

*Id.* at 345. "The cost of [those] operations was estimated in 1973 to exceed $16,000."[28] *Id.* Having learned of the cost and efforts required, the representative plaintiffs sought to redefine the class to include only persons who had bought fund shares during a specific time period and still held shares in the fund, so that individual notice could be sent in one of the fund's periodic mailings to its current shareholders. *Id.* That redefinition would have had the effect of excluding individual notice to 18,000 former fund shareholders who were class members, and reaching 68,000 current shareholders who were not class members. *Id.* The district court rejected the proposed redefinition because it arbitrarily reduced individual notice to the class. *Id.* at 346. The district court explained that "it [was] the responsibility of defendants to cull out from their records a list of all class members and provide [that] list to plaintiffs." *Id.* (citation and internal quotation marks omitted). The district court also held that the cost of that endeavor was "the responsibility of [the] defendants," though it did note that the representative plaintiffs would "then have the responsibility to prepare the necessary notice and mail it at their expense." *Id.* (citation and internal quotation marks omitted).

---

[28] When the Galleguillos Objectors provided the District Court with the revised 4.2 million estimate of class members that could be identified through Sprint's billing records, they noted that, using the inflation calculator on the United States Department of Labor website, the cost incurred to identify the 121,000 class members in *Oppenheimer Fund* would be approximately $80,000 in 2009 dollars. Those search efforts amounted to approximately 13 cents per class member using 1973 dollars, or approximately 64 cents per class member in 2009 dollars, adjusting for inflation.

The Second Circuit, en banc, affirmed, *id.* at 347-48, and the Supreme Court granted certiorari on the underlying cost-allocation problem, *id.* at 349. Although the Supreme Court held that the district court abused its discretion in requiring defendants to bear the expenses of identifying the class members,[29] the Court affirmed, *sub silentio*, the decision requiring the additional search efforts. *Id.* at 364. In particular, the Supreme Court concluded that the "information [from the transfer agent] must be obtained to comply with the [representative plaintiffs'] obligation to provide notice to their class." *Id.*

In the course of discussing the underlying cost-allocation issue, the *Oppenheimer Fund* court relied heavily on the decision of the United States Court of Appeals for the Fifth Circuit in *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088 (5th Cir. 1977). *See Oppenheimer Fund*, 437 U.S. at 355-60. The Fifth Circuit there discussed Rule 23(c)(2)'s individual notice requirement in the context of identifying a class of original retail purchasers of 371,000 new Datsun cars. The plaintiffs in *Nissan* had argued to the district court that the defendants, including Nissan Motor Corp. and every Datsun dealer nationwide, were "obligated to conduct and bear the costs of" an examination of 1.7 million Retail Delivery Report ("RDR") cards that recorded sales of new Datsun motor vehicles between 1966 and 1975 so that

_____

[29] The Supreme Court reached that conclusion because the plaintiffs could obtain the information by paying the transfer agent the same amount that the defendants would have to pay and that no special circumstances existed that warranted requiring the defendants to bear the expense. *Id.* at 363-64.

40

individual notice could be sent to class members. 552 F.2d at 1094. The district court instead only ordered the defendants, at their own expense, to prepare and submit a computer listing containing the names and addresses of currently registered Datsun owners, *id.*, "characterize[ing] the examination of the 1,700,000 RDR cards to extract the class members' names and addresses as an 'herculean task' and an 'unnecessarily time consuming and burdensome process,'" *id.* at 1096.

The Fifth Circuit, however, vacated the district court's class notice order, explaining:

> The source or sources providing the greatest number of names and addresses must be used. Obviously, the word "reasonable" cannot be ignored. In every case, reasonableness is a function of anticipated results, costs, and amount involved. A burdensome search through records that may prove not to contain any of the information sought clearly should not be required. On the other hand, a search, even though calculated to reveal partial information or identification, may be omitted only if its cost will exceed the anticipated benefits. Here, we know that the RDR cards provide the court with the best available listing of the names and addresses of all class members. Indeed, the parties agree on this. They only shy from undertaking the effort. While the search cannot be made with push-button ease, its advantages bring the effort required within the range of reasonableness.

*Id.* at 1098-99. The *Nissan* court then expounded on reasonableness:

> When the chore of examining defendants' RDR cards is juxtaposed to the efforts required to identify the … class members [in *Eisen v. Carlisle & Jacquelin*], it pales by comparison. The district court's characterization of the undertaking here as "herculean" is accurate only in relation to the class's size. The key, though, is reasonable effort, and a large class requires a large effort. Subdivision (c)(2) mandates that each class member be given the "best notice practicable under the circumstances." While the mechanical process of examining the cards may prove to be expensive and time-consuming, the individual right of absentee class members to due process makes the cost and effort reasonable.

*Id.* at 1100. Such effort was required because "[a]bsentee class members … generally have … no knowledge of the suit until they receive initial class notice [,and individual notice] will be their primary, if not exclusive, source of information for deciding how to exercise their rights under [R]ule 23." *Id.* at 1104. Accordingly, the Fifth Circuit ordered the district court "to require individual notice to the class based on the information available on the RDR cards." *Id.* at 1100.

We have been similarly stringent in enforcing the individual notice requirement. In *Greenfield v. Villager Industries, Inc.,* we vacated a district court's order approving a settlement because no effort was made to identify class

members from the defendant's stock transfer records for the purpose of giving individual notice; rather, only publication notice was used. 483 F.2d 824, 834 (3d Cir. 1973). We said that "a procedure such as the class action, which has a formidable, if not irretrievable, effect on substantive rights, can comport with constitutional standards of due process only if there is a maximum opportunity for notice to the absentee class member… ." *Id.* at 831. Citing Supreme Court precedent, we noted that publication notice "failed to satisfy due process requirements since '… it [was] not reasonably calculated to reach those who could be informed by other means at hand.'" *Id.* at 832 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 319 (1950)). We explained that, "[w]here names and addresses of members of the class are easily ascertainable, … due process would dictate that the 'best notice practicable under the circumstances …' would be individual notice." *Id.* at 832 (quoting Fed. R. Civ. P. 23(c)(2)). Our holding, based on *Eisen*, was straightforward: "'[a]ctual notice must be given to those whose identity could be ascertained with reasonable effort.'" *Id.* (quoting *Eisen*, 479 F.2d at 1009, *aff'd* 417 U.S. 156). We also said that it was "[t]he ultimate responsibility" of the district court to ensure that the parties complied with notice requirements because "the district court [is] … the guardian of the rights of the absentees." *Id.*

Those cases notwithstanding, Sprint cites a decision from the Northern District of Georgia, *In re Domestic Air Transportation Antitrust Litigation*, to support its claim that it would be unreasonable to require it to search its billing records so that individual notice can be sent to more people. 141 F.R.D. 534 (N.D. Ga. 1992). *Domestic Air* involved a class action on behalf of purchasers of "domestic airline

43

passenger tickets from one or more of the defendant airlines … to and/or from a defendant's hub." *Id.* at 537. Initially, the defendants had argued to the Court that class members could not be identified from the airlines' records for the purposes of compiling a list to provide those members with individual notice. *Id.* at 539. After the Court certified the class, an evidentiary hearing was held regarding "the proposed content, timing, and method of notice." *Id.* at 538. At that hearing, the plaintiffs agreed with the defendants' initial position "that class members … [could not] be identified with reasonable effort and thus there [was] no list of class members to which mandatory individual notice [could] be given." *Id.* The defendants, however, in an abrupt "about face," *id.* at 540, then "insist[ed] that it [was] possible to identify a partial list of class members, and plaintiffs must, therefore, individually notify persons on the partial list," *id.* at 538. In support, the defendants said they had developed a list containing more than 9.3 million names and addresses of possible class members. *Id.* at 541.

The district court took a different view. It determined that the list developed by the defendants was not a list of class members, and it found "as a fact that class members [could not] be identified at [that] time through reasonable effort." *Id.* at 541. As the district court saw it, the defendants' list was both over-inclusive and under-inclusive, and it was thus "'impossible to estimate how many absentee class members would receive individual notice.'" *Id.* at 545 (quoting *Nissan*, 552 F.2d at 1099). Cautioning that "'reasonableness is a function of anticipated results, costs, and amounts involved,'" *id.* at 547 (quoting *Nissan*, 552 F.2d at 1099), the court concluded that

44

> this [was] not the classic case where Rule 23(c)(2) individual notice [was] mandated. In cases such as *Eisen* and *Nissan* the records kept by the defendants indisputably contained the names and addresses of the universe of class members. … Because the [list at issue in *Domestic Air*] [was] not a list of class members, there [was] no way to assure that notice to the list would definitely result in notice to a substantial number of class members.

*Id.* at 546. Thus, the district court did "not direct individual mail notice … to the … list." *Id.*

The decision in *Domestic Air* is no support for Sprint here. On the contrary, as the District Court in this action had initially noted in its order holding the INP deficient, "*Domestic Air* does not stand for the proposition that partial class lists do not require individual notice; rather, it adopted quite the opposite formulation. Partial lists – to the extent they are accurate – would require 23(c)(2)-compliant notice." (AJA at 4262.) After relying on both *Eisen*, (*see* AJA at 4263 ("Given that *Eisen* required notice to a partial class and that it pronounced constructive notice to be especially unreliable, this Court is hard-pressed to find Sprint's arguments persuasive.")), and *Nissan*, (*see* AJA at 4263 ("Nor does the fact that a large effort is required to identify a subset of class members automatically render individual notice inapplicable." (citing *Nissan*, 552 F.2d at 1100))), the District Court found

> that Sprint must do more than it ha[d] done so far. The fact that not every member of the class

45

can receive the best notice does not mean that everyone gets the least notice. Rather, those subclasses capable of reasonable identification require individual notice. *This especially holds true in a case such as this one, where those who paid an ETF are entitled to recover the lion's share of the settlement but are generally unlikely to be current Sprint customers.* Sprint shall attempt to identify subclasses of individuals and include individual notice to those persons.

(AJA at 4264 (emphasis added).)

Despite that well-grounded and thoroughly persuasive conclusion, the District Court, much like the defendants in *Domestic Air*, did something of an about face when it approved the ANP proposed by Sprint and Class Counsel. Other than a general reference to the Rice Declaration for the proposition that the "time, cost, and effort necessary to [conduct a partial search of its billing records to provide individual notice to a subset of class members who were charged ETFs] … would be unreasonable in light of all the circumstances" (AJA at 22), the Court did not provide any support for its new and very different determination that Sprint did not need to conduct a search of its billing records to provide individual notice to a larger group of class members. This is particularly puzzling given that the District Court had said, in its order holding the INP deficient, that "Sprint *can* run targeted searches that pull relevant information for sub-classes of individuals." (AJA at 4260 (emphasis added).)

Viewing "reasonableness [as] a function of anticipated results, costs, and amount involved," *Nissan*, 552 F.2d at 1099, the District Court's changed determination, based solely on the Rice Declaration, that it would be unreasonable for Sprint to undertake any search of its own billing records was "an errant conclusion of law or an improper application of law to fact." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d at 341 (citation and internal quotation marks omitted). Similar to *Eisen*, where at least 2.25 million class members could have been identified by names and addresses, Sprint has acknowledged here that the database search outlined in the Rice Declaration "could result in the identification of millions of Settlement Class Members."[30] (AJA at 4706.) The cost of identifying those "millions" of class members is approximately $100,000. If only two million people were identified through that billing records search, the search would have cost approximately 5 cents per class member identified in 2009. Including the expense of mailing the individual notice, the cost would have been approximately 43 cents per class member.[31] Given the size of the class and the

_____

[30] Sprint confirmed that fact in both its brief, (*see* Sprint's Br. at 37 n.20 (stating "[a]t the time the District Court conducted its analysis, the record was clear that the efforts that Sprint described in the Rice Declaration could result in the identification of millions of class members (albeit at an unreasonable expenditure of time, effort and money)")), and at oral argument, (*see* Oral Argument Transcript ("Tr.") 26:18-20 (answering that it was "without question" that there were "potentially millions of class members in" the billing database)).

[31] Using the 4.2 million estimate given by the Galleguillos Objectors, the search would have cost less than

due process rights at stake, these are not troublingly high sums.

Even if the costs had been higher, however, that would not automatically mean they were unreasonable. *Eisen* expressly rejected the argument that costs are the primary driver in the judgment on notice, because "individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23 … ." 417 U.S. at 176. Here, the costs per class member were projected to be less than the per-member cost for individual notice in both *Eisen* and *Oppenheimer Fund*, after adjusting for inflation.[32]

2.5 cents per class member. If, however, there were actually 4.2 million class members that were identified, that would, of course, increase the cost of mailing notice to those individuals. Assuming that the cost of mailing postcard notice was 38 cents per postcard, which was the estimate used to determine the cost of the mailing to the *Robertson* class in the ANP, it would have cost approximately $1.6 million to mail 4.2 million postcards in 2009. At oral argument, however, counsel for Sprint conceded that mailing expenses ought not be factored into the analysis if it is known how many class members are identifiable. (*See* Tr. 29:6-8 ("I understand you can't [object to] expenses when it comes to the mailing. If they're identifiable, they've got to be mailed to. I get that.").)

[32] Excluding mailing expenses, the cost of identifying contact information and preparing the individual notice forms for the 2.25 million class members in *Eisen* in 1971 was $90,000. *See Eisen*, 417 U.S. at 167 (noting that, including the postage rate of six cents, the expense of stuffing and

48

Sprint refers to the "cumbersome process required to search its vast data environments" (Sprint's Br. at 35) and argues that "[e]ven assuming that the efforts outlined in the Rice Declaration would yield 4.2 million … [c]lass members, it is simply another way of restating the already known [fact that,] with significant effort, a large number of … [c]lass members could be identified," (Sprint's Br. at 37-38). Instead, Sprint asserts that "[t]he question before the District Court … was whether that effort was reasonable," and "the Court reviewed the efforts outlined in the Rice Declaration and determined, within its sound discretion, that it would be unreasonable to have Sprint undertake those efforts." (Sprint's Br. at 38.) But, if the efforts detailed in the Rice Declaration, whereby a computer program would have to run search queries in certain databases, would identify 4.2 million class members, we fail to see why running those search inquiries is unreasonable, and no explanation for that conclusion was provided by the District Court. In fact, the effort that would be required here seems less significant than the efforts required in *Eisen*, 52 F.R.D. at 257 (identifying at least two million individuals "[b]y comparing the records and tapes of the odd-lot firms with the wire firm tapes which contain the name and address of each customer"), or in

mailing the 2.25 million notice forms would cost $225,000). After adjusting for inflation, that cost would have been approximately $477,000 in 2009, or 21 cents per class member. *See* Dep't of Labor, *Bureau of Labor Statistics CPI Inflation Calculator*, http://bls.gov/data/inflation_calculator.htm**.** The cost of the efforts to compile the list required in *Oppenheimer Fund*, excluding mailing expenses, was approximately 64 cents per class member in 2009 dollars. *See supra* note 28.

49

*Oppenheimer Fund*, 437 U.S. at 345 (requiring transfer agent's employees to "sort manually through a considerable volume of paper records, keypunch between 150,000 and 300,000 computer cards, and create eight new computer programs for use with records kept on computer tapes that either [were] in existence or would have to be created from the paper records."), or in *Nissan*, 552 F.2d at 1094, 1096 (undertaking examination of 1.7 million RDR cards to identify names and addresses of 371,000 original retail purchasers, an examination that the district court called "herculean" and "unnecessarily time consuming and burdensome").

As did the parties in *Nissan*, it appears that Sprint and the Class Representatives would agree that the search of the billing records would "provide … the best available listing of the names and addresses of … class members [who were charged ETFs]. … They only shy away from undertaking the effort." *Id.* at 1099. While it may be that a search of the billing records to find class members who have been charged flat-rate ETFs "cannot be made with push-button ease," "its advantages," based on the admissions made by Sprint itself, appear likely to "bring the effort required within the range of reasonableness." *Id.* Because we have no way of knowing what in the Rice Declaration caused the District Court to change its mind about the need for a search of the billing records, "the individual right of absentee class members to due process" under Rule 23(c)(2) may have been violated. *Id.* at 1100. In light of the principles outlined in *Eisen*, *Oppenheimer Fund*, and *Nissan*, and our own precedent calling for "a maximum opportunity for notice to the absentee class member," *Greenfield*, 483 F.2d at 831; *see Girsh v. Jepson*, 521 F.2d 153, 159 (3d Cir. 1975) (noting our

50

"Circuit's strong policy in favor of 'maximum notice'"), the District Court needs to do more to fulfill its duty as "the guardian of the rights of the absentees" to ensure that the parties complied with the individual notice requirement of Rule 23(c)(2), *Greenfield*, 483 F.2d at 832.

We will therefore remand to the District Court to again assess whether the ANP passes muster under Rule 23(c)(2). Given Sprint's concession that a billing records search could result in identifying millions of class members who were charged a flat-rate ETF – individuals who are in the sweet spot of the proposed class – we are not sure how it can be said that it is unreasonable for Sprint to search any of its billing records, but we leave that determination to the District Court, to be made on a more complete record and with a fuller explanation. In that connection, we note the availability of statistical sampling of Sprint's billing records as a means to provide the District Court with a better grounded estimate of the number of class members who could, through a search of those records, be identified during the relevant period.[33]

---

[33] Guidelines in the electronic discovery realm that contemplate statistical sampling to assist in the cost-benefit analysis required under Federal Rule of Civil Procedure 26(b)(2)(C)(iii) may also help determine what is a "reasonable effort" in the class action context under Rule 23(c)(2). In assessing whether to limit discovery, a court may be required to consider whether "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). One of the Sedona

Conference Principles of Proportionality, a set of guidelines that offer a framework for the best electronic discovery practices, provides that "[e]xtrinsic information and sampling may assist in the analysis of whether requested discovery is sufficiently important to warrant the potential burden or expense of its production." The Sedona Conference® WG1, *The Sedona Conference® Commentary on Proportionality in Electronic Discovery* 291 ("*Sedona Commentary*") (2010), *available at* http://www.thesedonaconference.org/content/miscFiles/Proportionality2010.pdf. The commentary to that principle provides as follows:

> When asked to limit discovery on the basis of burden or expense, courts must make an assessment of the importance of the information sought. Discovery should be limited if the burden or expense of producing the requested information is disproportionate to its importance to the litigation. Performing such an assessment can be challenging, given that it may be impossible to review the content of the requested information until it is produced.
>
> In some cases, it may be clear that the information requested is important – perhaps even outcome-determinative. In other cases, courts order sampling of the requested information, consider extrinsic evidence, or both, to determine whether the requested information is sufficiently important to warrant potentially burdensome or expensive discovery.

*Sedona Commentary* 299 (internal footnote omitted); s*ee*

Once that estimate is made, the Court, weighing the "anticipated results, costs, and amount involved," *Nissan* 552 F.2d at 1099, should be able to determine whether a full search of the subject period would be reasonable, especially in light of the fact that the class members who were charged a flat-rate ETF were the ones who were "entitled to recover the lion's share of the settlement" (AJA at 4264) but were unlikely to otherwise know of it. *See Nissan*, 552 F.2d at 1104 ("Absentee class members will generally have had no knowledge of [a] suit until they receive the initial class notice [,which] will be their primary, if not exclusive, source of information… .").

Advisory Committee Notes to Fed. R. Civ. P. 26(b)(2) ("[T]he parties may need some focused discovery, which may include sampling of the sources, to learn more about what burdens and costs are involved in accessing the information, what the information consists of, and how valuable it is for the litigation in light of information that can be obtained by exhausting other opportunities for discovery.").

We do not suggest that e-discovery practice provides a perfect parallel. An important point of distinction is that we already know it is of high importance to gain access to individual-identifying information in the class notice context, *see Eisen*, 417 U.S. at 176 ("[I]ndividual notice to identifiable class members is … an unambiguous requirement of Rule 23."), and the billing records here are admitted to have such information, whereas the value of much discovery information will be largely unknown until tested. Nevertheless, these e-discovery principles may provide a helpful template.

B.    *Adequacy of Representatives*

Although we remand to the District Court to further address the notice issues, we also suggest that the Court consider again whether the Class Representatives can adequately represent all class members. The Galleguillos Objectors allege that the Class Representatives are inadequate since none of them were "current subscribers subject to Sprint's illegal ETFs" at the time that the Settlement Agreement was executed. (Galleguillos Objectors' Opening Br. at 59.) One of the essential problems with the settlement, as those objectors see it, is "the license it grants to Sprint to continue making illegal ETF charges against current subscribers." (*Id.* at 60.) According to the Galleguillos Objectors, because "[t]he claims of the class representatives are … atypical of the claims ….of [current subscribers,] … the class representatives are inadequate representatives." (*Id.*) Sprint responds that the Class Representatives satisfy the adequacy requirement of Rule 23(a)(4) because their interests "[were] not antagonistic to those of the class."[34] (Sprint's Br.

---

[34] Sprint also emphasizes the adequacy of Class Counsel, as did the District Court, and we agree with Sprint and the District Court that Class Counsel were "well-equipped to handle a case of this size and complexity." (AJA at 11.) Sprint further argues that the Galleguillos Objectors lack standing to complain about the adequacy of the Class Representatives because those objectors allegedly conceded to the District Court that they themselves were not Sprint customers at the time that the Settlement Agreement was executed. One of the Galleguillos Objectors, however, arguably was a current Sprint customer at the time that the Settlement Agreement was executed on December 3, 2008.

at 22 (citations and internal quotation marks omitted).)

As noted earlier, Rule 23(a)(4) provides that, in order to certify a class, a court must find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest

(*See* AJA at 1681 ("I, ANTRANICK HARRENTSIAN, declare … I had an account with Sprint … [and] [o]n or about December 8, 2008, Sprint charged my account for [two] early termination fees (ETFs) of $200 apiece, for a total of $400.").) Whether or not any of the Galleguillos Objectors were current Sprint customers at the time that the Settlement Agreement was executed, however, they still had constitutional standing to make such an objection because they were class members who had asserted that objection to the District Court. *See Devlin v. Scardelletti*, 536 U.S. 1, 6-7 (2002) (noting that as long as an individual is a member of the class, that individual "has an interest in the settlement that creates a 'case or controversy' sufficient to satisfy the constitutional requirements of injury, causation, and redressability" (citations omitted)). Even assuming *arguendo* that they did not have constitutional standing to bring an objection based on adequacy of representation, the District Court still has an independent duty to ensure that all class members are adequately represented. *See Greenfield*, 483 F.2d at 832 (noting "the district court [is] … the guardian of the rights of the absentees"); *see also Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010) ("Under Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent class members." (quoting *In re AT&T Corp.*, 455 F.3d 160, 175 (3d Cir. 2006))).

between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). More specifically, as we stated in *In re Community Bank of Northern Virginia*, the inquiry has two purposes: "to determine [1] that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, … and [2] that there is no conflict between the individual's claims and those asserted on behalf of the class."[35] 622 F.3d 275, 291 (3d Cir. 2010) (ellipsis in original) (quoting *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988)). "This inquiry is vital, as 'class members with divergent or conflicting interests [from the named plaintiffs and class

---

[35] Several other circuits are in accord. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) ("To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" (citation and internal quotation marks omitted)); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." (citation and internal quotation marks omitted)); *Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 626 (6th Cir. 2007) ("Class representatives are adequate when it appear[s] that [they] will vigorously prosecute the interests of the class … ." (citation and internal quotation marks omitted)).

counsel] cannot be adequately represented… .'" *Id.* at 291-92 (alteration in original) (quoting *In re Diet Drugs Prods. Liab. Litig.*, 385 F.3d 386, 395 (3d Cir. 2004)).

In its opinion approving the settlement here, the District Court focused on the second purpose of the *Community Bank* inquiry as to Rule 23(a)(4), i.e., the "no conflict" part.[36] The Court stated that "'the plaintiff must not have interests antagonistic to those of the class,'" (AJA at 11 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450 (D.N.J. 1997))), and it found that the Class Representatives did not.

If that were the complete test, we would perhaps be less concerned about the District Court's finding of adequacy under Rule 23(a)(4), but the test cited by the District Court fails to include the first and, in this instance,[37] likely the most

---

[36] As noted *supra* at note 34, as part of the Rule 23(a)(4) inquiry, the District Court also analyzed whether Class Counsel was adequate. "'Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) … those questions have, since 2003, been governed by Rule 23(g).'" *In re Cmty. Bank of N. Va.*, 622 F.3d at 292 (quoting *Sheinberg v. Sorenson*, 606 F.3d 130, 132 (3d Cir. 2010)).

[37] None of the objectors claim that the interests of the Class Representatives were "antagonistic" to those class members who were current subscribers subject to a flat-rate ETF on the date that the Settlement Agreement was executed. Merriam-Webster defines "antagonism" as "actively expressed opposition or hostility" or "opposition of a

important part of the *Community Bank* inquiry. That part requires that the Class Representatives have "the ability and the incentive to represent the claims of the class vigorously." *In re Cmty. Bank of N. Va.*, 622 F.3d at 291 (citation omitted). Here, it is difficult to understand how the Class Representatives, none of whom were Sprint customers at the time that the Settlement Agreement was executed, had the interest, much less the incentive, to stop Sprint from enforcing flat-rate ETFs against its current customers. *Cf. id.* at 311 (vacating decision to certify class "because the settlement appear[ed] to lack 'structural assurance of fair and adequate representation for the diverse groups and individuals affected'" (quoting *Amchem*, 521 U.S. at 627)); *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 17 n.6 (2d Cir. 1981) ("Th[e] justification for permitting the representatives to sue on behalf of the class has no application to claims of class members in which the representatives have no interest and which … they are willing to throw to the winds in order to settle their own claims.").

The District Court rejected the objectors' adequacy of representation argument, in part,[38] because it found that, even if class members who were subscribers at the time that the Settlement Agreement was executed were still subject to a flat-rate ETF, those members would be entitled to the relief

conflicting force, tendency, or principle." *Merriam-Webster's Collegiate Dictionary* 48 (10th ed. 2002).

[38] The Court also pointed out that the injunctive relief that the Galleguillos Objectors sought "could potentially expose [current subscribers] to a counterclaim for damages from Sprint." (AJA at 12.)

58

afforded under Category IV of the Settlement Agreement. We briefly note, however, the dissimilar treatment received by class members who only qualified for benefits under Category IV, but who were similarly situated to class members who qualified for benefits either under Category I (charged and paid a flat-rate ETF) or Category II (charged but did not pay a flat-rate ETF).[39]  Those class members who were Sprint customers as of March 15, 2010 – the claim deadline for Categories I and II[40] – but terminated their contract between March 15 and December 31, 2010 and were charged a flat-rate ETF,[41] only qualified for benefits under Category IV, which provided for certain non-cash relief.[42]

---

[39] We recognize that, while adequacy of representation cannot be determined solely by reviewing the settlement benefits available to class members, examining such benefits may be indicative of whether the Class Representatives did, in fact, vigorously represent the claims of all class members. *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011) ("The Supreme Court's decision in *Amchem* … allows courts, in assessing the adequacy of representation, to examine a settlement's substance for evidence of prejudice to the interests of a subset of plaintiffs.").

[40] The deadline for submitting a claim form to receive Category IV benefits was January 1, 2011.

[41] The last flat-rate ETF contract did not expire until December 31, 2010.  *See supra* note 5.

[42] Specifically, Category IV provides that qualifying class members are entitled to receive one of three benefits: (i) a prepaid 90 minute long distance calling card; (ii) if the class member wanted to activate a new line of service with Sprint,

That relief is far different from the relief that other similarly situated class members were entitled to under Category I or Category II.[43]  (*See* AJA at 285 (providing a $90 payment to class members under a two year contract who terminated any time between the seventh and twenty-fourth month and paid a flat-rate ETF); AJA at 287-88 (providing a $90 credit to class members under a two year contract who terminated any time between the seventh and twenty-fourth month and were charged, but did not pay, a flat-rate ETF).)

Nevertheless, because that objection was not made before the District Court with the clarity it has been pressed

---

a waiver of the $36 activation fee normally associated with a two-year contract, and 100 free bonus minutes per month for the first year of that two year contract; or (iii) 300 free text messages per month for six months.

Throughout oral argument, class members who only qualified for Category IV benefits were referred to as those in the "donut hole."  The term "donut hole" captures the idea that there is a difference in coverage between class members in Categories I and II and other members who were similarly situated to them but were unable to acquire the same relief under the Settlement Agreement.

[43] Indeed, Class Counsel concedes as much.  (*See* Class Counsel Rule 28(j) Ltr. at 1 ("*Except for subscribers in the 'donut hole'*, all persons with a flat-rate ETF who terminated their contract and were charged an ETF, whether before or after the settlement, were identically situated and identically treated, thus, were adequately represented." (emphasis added) (citation omitted)).)

on us,[44] we will not opine on the District Court's conclusion that the Class Representatives can adequately represent all class members. That being said, because the case must be considered again on the notice issue, and because the adequacy issue is one of high significance, we urge the District Court to consider again in greater detail whether the Class Representatives are adequate under Rule 23(a)(4).

---

[44] In its letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), Class Counsel argues that because the Galleguillos Objectors did not specifically raise the "donut hole" objection prior to oral argument, they have waived it. That assertion is debatable. The Galleguillos Objectors did object to the adequacy of representation based on the fact that Sprint was still allowed to charge flat-rate ETFs against current subscribers who had contracts containing flat-rate ETFs, and a logical extension of that objection can arguably be that Sprint could continue to enforce flat-rate ETFs without a remedy for those subscribers that was identical to what other similarly situated class members received under the Settlement Agreement. That being said, because those objectors did not explain this issue to the District Court in nearly the level of detail as they explained it to us at oral argument, the waiver argument that Class Counsel advances is not without weight. Whether or not the "donut hole" objection was waived, we note again that the District Court has an independent duty to ensure that all class members are adequately represented. *See supra* note 34.

### III.    Conclusion

With full appreciation for the considerable efforts that have been invested in the settlement of this class action, we emphasize again the judicial duty to act as the guardian of absent class members.  For the reasons stated, we conclude that that duty was not fully met and, accordingly, vacate the District Court's January 15, 2010 order and remand the case for further proceedings consistent with this opinion.